# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| LINDA YOUNG | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No.  4:21-CV-00644-ALM |
| | § | Judge Mazzant |
| JAMES ERSHICK, Individually and as | § | |
| Executor of the ESTATE OF | § | |
| CONSTANCE ERSHICK, DECEASED | § | |
| *Defendant.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are Plaintiff Linda Young's Motion for Summary Judgment (Dkt. #23) and Defendant James Ershick's Motion for Summary Judgment (Dkt. #29).  Having considered the motions and the relevant pleadings, the Court finds that Plaintiff's Motion for Summary Judgment (Dkt. #23) should be **GRANTED in part**, and Defendant James Ershick's Motion for Summary Judgment (Dkt. #29) should be **DENIED**.

## BACKGROUND

In 2013, Eric James Ershick (the "Decedent") married Plaintiff Linda Young ("Young") (Dkt. #30 at p. 5).  Prior to entering marriage, Decedent and Plaintiff allegedly entered into a premarital agreement (the "PMA") (Dkt. #29, Exhibit 13).  On October 9, 2019, the Decedent died without a will (Dkt. #30 at p. 5).  On December 12, 2019, Plaintiff filed an Application for Administration of the Estate of Decedent in the Denton County Probate Court (Dkt. #23 at p. 2).  On January 16, 2020, James and Constance Ershick—Decedent's parents (the "Ershicks")—filed an opposition and objection to Plaintiff's application (Dkt. #23 at p. 2).  In May 2020, the Ershicks

served several discovery requests on Young (Dkt. #32, Exhibit 2 ¶ 10; Dkt. #32, Exhibit 1 pp. 23–

36).  For example, Request for Production #23 stated:

> Provide a copy of all estate planning documents (e.g. wills, powers of attorney,
> directive to physicians, healthcare power of attorney, designation of agent, trusts,
> bank signature cards, survivorship agreements, marital or premarital agreements,
> etc.) made or executed from date of marriage to date of death by either you or
> Decedent.

(Dkt. #32, Exhibit 1 at p. 34).  Further, Request for Production #5 requested all "joint signature

documents between you and Decedent . . . from date of marriage to date of death" (Dkt. #29-1 at

p. 7).

According to Young's attorney, David Chowins ("Chowins"), at the time of the discovery,

under the Texas Rules of Civil Procedure, there was no duty to disclose relevant documents unless

properly requested  (Dkt. #32, Exhibit 2 ¶ 11).  Further, according to him, because of the date

restrictions in the requests and based on some objections he made,  he believed that no request

required the disclosures of the PMA (Dkt. #32, Exhibit 2 ¶ 10).  Between June and August 2020,

the Ershicks filed three motions to compel regarding the discovery responses—though none

specifically related to the PMA (Dkt. #29-9; Dkt. #29-10; Dkt. #29-11).  On August 20, 2020, the

Denton County Probate Court held a hearing on the motions to compel but did not rule on them

(Dkt. #29-14 at p. 5).

On August 31, 2020, Richard Kelsey ("Kelsey"), the Ershick's attorney, took the

deposition of Plaintiff (Dkt. #32, Exhibit 1 at p. 41).  After Kelsey asked whether Plaintiff and

Decedent "ha[d] a premarital agreement of any kind," Plaintiff responded:

> Yes, I guess you could say that. We - - we had this little rinky-dink thing that we
> printed off. And then we found out later that it was probably no good because we
> didn't go to a lawyer and have one drawn up and signed and notarized and all of
> that kind of good stuff, so . . .

(Dkt. #32, Exhibit 1 at p. 41). Kelsey then asked Plaintiff if she still had a copy of the agreement, and Plaintiff responded "Probably" (Dkt. #32, Exhibit 1 at p. 41). At that point, Kelsey asked Plaintiff why he had not received the agreement even though he had "asked for [it]," and Chowins objected to the question on work-product grounds (Dkt. #32, Exhibit 1 at p. 41).

On October 27, 2020, almost two months after Plaintiff's deposition and prior to any ruling on the discovery motions, the parties attended a mediation session via Zoom video conferencing (Dkt. #23 at p. 2; Dkt. #30 at p. 3). At the mediation, the parties entered a Rule 11 Agreement (the "Rule 11 Agreement" or the "Agreement") pursuant to the Texas Rules of Civil Procedure (Dkt. #23 at p. 2). The Rule 11 Agreement was signed by all parties and filed with the Denton County Probate Court the same day (Dkt. #23 at p. 2). The Rule 11 Agreement provides that it "will be reduced to a [later-drafted] Family Settlement Agreement ("FSA")," which "shall recite additional terms necessary to complete the Agreement." (Dkt. #29, Exhibit 12).[1] However, section nine of the Rule 11 Agreement also provides that the Agreement "is intended to be a complete and final agreement . . . not subject to revocation by the Parties[,] and is intended to be the basis for a final and binding settlement" (Dkt #29, Exhibit 12).

According to the Rule 11 Agreement, Plaintiff agreed to pay the Ershicks $5,000, make the 1979 Chevrolet Camaro available for pickup at 11122 Sugar Mill Lane, Frisco, Texas ("Sugar

---

[1] Defendant objects to disclosure of the contents of the Agreement because it is a record made at mediation and is confidential under § 154.073(b) of the Texas Civil Practice and Remedies Code (Dkt. #30 at pp. 3–4); *See* TEX. CIV. PRAC. & REM. CODE ANN. § 154.073(b) (providing that "[a]ny record made at an alternative dispute resolution is confidential, and the participants or the third party facilitating the procedure may not be required to testify in any proceedings relating to or arising out of the matter in dispute or be subject to process requiring disclosure of confidential information or data relating to or arising out of the matter in dispute"). However, Defendant submitted the Rule 11 Agreement as an exhibit in his summary judgment motion (Dkt. #29-18). Furthermore, as Plaintiff notes, Defendant ignores the fact that the document was filed in the public record with the consent of all parties (Dkt. #31 at p. 2). Thus, the Court considers the contents of the Rule 11 Agreement. Indeed, "[t]o hold otherwise would be tantamount to rendering these types of agreements unenforceable, which is contrary to the law." *Fastracked Exec., LLC v. Prevost Car (US), Inc*., No. 01-20-00735-CV, 2022 WL 2068817, at *9 (Tex. App.—Houston [1st Dist.] June 9, 2022, no pet.).

Mill Lane"), and subsequently transfer title to it, as well as deliver the property in Exhibit A of the Rule 11 Agreement to the Ershicks at Sugar Mill Lane (Dkt. #29, Exhibit 12).  In exchange, the Ershicks agreed to make no other claim to any property of Decedent's estate including the real property located at Sugar Mill Lane and agreed to allow Plaintiff to be the independent administrator (Dkt. #29, Exhibit 12).  Additionally, under the Agreement, all parties agreed to execute global releases and to execute all documents to affect the terms of the Agreement, and each agreed to pay their own attorney's fees (Dkt. #29, Exhibit 12).  Per the Rule 11 Agreement, Chowins was tasked with drafting the initial FSA and Kelsey was given seven days to respond to the FSA draft (Dkt. #29, Exhibit 12).

On November 4, 2020, pursuant to the Rule 11 Agreement, Chowins submitted a draft of the FSA to  Kelsey (Dkt. #23 at p. 3; Dkt. #30 at p. 4).  On November 6, 2020, Kelsey responded to Chowins' email, redrafting parts of the FSA (Dkt. #23, Exhibit 4).  The email exchanges reveal that the parties disagreed over details of the FSA—namely whether the Ershicks would have one or three days to retrieve the property identified in Exhibit A of the Rule 11 Agreement at Sugar Mill Lane and whether the Ershicks would be allowed to walk through the Sugar Mill Lane property to retrieve the personal items, as well as whether additional items of Decedent would be given to the Ershicks in exchange for something of value (Dkt. #23, Exhibit 4; Dkt. #23, Exhibit 5).  According to Plaintiff, she was ready, able, and willing to perform every obligation required of her under the Rule 11 Agreement and the proposed FSA, but the Ershicks refused to sign the FSA (Dkt. #23 at p. 3; Dkt. #30 at pp. 4–5).  Indeed, Defendant admits that he withdrew his consent to the Rule 11 Agreement via email on November 17, 2020 (Dkt. #30 at p. 6).

On February 24, 2021, Chowins, on behalf of Young, sent the Ershicks a notice of breach letter (Dkt. #23, Exhibit 3 at pp. 58–59).  One day letter, Kelsey responded, stating: "There can be

4

no resolution of this case until you and your client produce the premarital agreement your client acknowledged under oath existed and that she had a copy of" (Dkt. #30, Exhibit 5).  Moreover, in the letter, Kelsey acknowledged that his "client has repudiated the Rule 11 Agreement" (Dkt. #30, Exhibit 5).  On March 25, 2021, the Probate Court ordered Young to produce the PMA, which she later did (Dkt. #29 at p. 3).   On April 21, 2021, Young filed suit for breach of contract in the Denton County Probate Court, requesting specific performance, damages, and attorney's fees (Dkt. #2).[2]  On July 30, 2021, Defendant James Ershick was served, and, on August 14, 2021, Defendant removed the action from the Denton County Probate Court to the Eastern District Court of Texas based on diversity jurisdiction (Dkt. #1).

On February 10, 2022, Plaintiff filed her motion for summary judgment, requesting that the Court enter judgment on her breach of contract claim (Dkt. #23).  On February 28, 2022, Defendant filed his motion for summary judgment, asking the Court to grant him a take nothing judgment and deny Plaintiff's motion for summary judgment  (Dkt. #29).  On March 10, 2022, Defendant filed his response to Plaintiff's motion for summary judgment (Dkt. #30).  On March 17, Plaintiff filed her reply to her summary judgment motion, (Dkt. #31), and on March 24, 2022, Defendant filed his sur-reply (Dkt. #33).   On March 21, 2022, Plaintiff filed her response to Defendant's motion for summary judgment (Dkt. #32). On March 28, 2022, Defendant filed his reply (Dkt. #34), and Plaintiff later filed her sur-reply (Dkt. #35; Dkt. #36).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary judgment is proper

---

[2] In January 2021, Constance Ershick passed away (Dkt. #29 at p. 3).  Accordingly, though both the Ershicks signed the Rule 11 Agreement, Young is suing James Ershick Individually and James Ershick as Executor of the Estate of Constance Ershick.

under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Substantive law identifies which facts are material. *Id.*  The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323.  If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49).  A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257.  Mere denials of material facts, unsworn allegations, or arguments and assertions in

6

briefs or legal memoranda will not suffice to carry this burden.  Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)).  The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Plaintiff and Defendant both move for summary judgment (Dkt. #23; Dkt. #29).  Plaintiff's motion argues that summary judgment should be granted for her breach of contract claim because the parties entered a valid contract—the Rule 11 Agreement—and the Ershicks breached the contract by refusing to dismiss their challenge to the application for administration and refusing to give consent to the appointment of Plaintiff as independent administrator without bond (Dkt. #23 at p. 8).  Defendant's motion for summary judgment contends that two main reasons preclude a judgment for Plaintiff: (1) the Rule 11 Agreement is not a binding contract; and (2) fraudulent concealment of the PMA voided any such contract (Dkt. #29 at pp. 10–11).

Thus, the summary judgment motions present several issues to be decided by the Court: (1) whether the parties formed a valid contract when they entered the Rule 11 Agreement; (2) whether Defendant's asserted fraudulent concealment defense prevents summary judgment for Plaintiff; and (3) whether Plaintiff can prevail on her breach of contract claim if she proves the Rule 11 Agreement was a valid contract.  The Court will examine these issues in turn, considering all the briefing together because of the substantial overlap in the arguments within the filings, and beginning with determining whether the Rule 11 Agreement is a valid contract.

## I.     Whether the Rule 11 Agreement is a Valid Contract[3]

The briefing of the parties reveals that the crux of their dispute is the effect of the Rule 11 Agreement.  Plaintiff argues that the parties formed a valid contract when they entered into the Rule 11 Agreement (Dkt. #23 at p. 8).  Conversely, Defendant asserts various reasons why the Rule 11 Agreement is not enforceable—namely because (1) Defendant withdrew his consent before any action by the trial judge (Dkt. #30 at p. 6); (2) the parties did not intend for it to be a binding contract (Dkt. #30 at p. 16); (3) there was no meeting of the minds as to the essential terms of the Agreement (Dkt. #29 at p. 7); (4) the terms of the Rule 11 Agreement are not sufficiently definite (Dkt. #30 at p. 16); and (5) Plaintiff's obligations under the Agreement were illusory (Dkt. #30 at p. 12).[4]  The Court considers these issues in turn, starting with Defendant's argument that the Rule 11 Agreement is not a contract because Defendant withdrew his consent and "Rule 11 is only a procedural tool and is not applicable to contract law" (Dkt. #34 at p. 1).

### A.  Enforcement of Rule 11 Agreements as Contracts

Defendant argues that "Plaintiff has erroneously conflated the role and function of a Rule 11 Agreement and a contract" (Dkt. #30 at p. 14).  According to Defendant, "[a] Rule 11

---

[3] "It is a long-recognized principle that federal courts sitting in diversity cases 'apply state substantive law and federal procedural law.'" *Shady Grove Orthodpedic Assoc., P.A., v. Allstate Ins. Co*., 559 U.S. 393, 417 (2010) (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)).  Under Texas law, in contract cases where the parties have not agreed to the contrary, the law of the state with the most significant relationship should be applied. *Duncan v. Cessna Aircraft Co*., 665 S.W.2d 414, 421 (Tex. 1984).  Here, it appears that Texas has the most significant relationship to the Rule 11 Agreement—it was filed in a Texas probate court, concerns real property and performance in Texas, and one of the parties to the Agreement resides in Texas. *See Faloona by Fredickson v. Hustler Mag., Inc*., 799 F.2d 1000, 1003 (5th Cir. 1986) (noting contacts to take into account in determining the applicable law include the place of contracting and place of performance).  Further, the parties appear to agree that Texas law governs their dispute, as they cite to Texas law and Fifth Circuit cases applying Texas law in their briefing. *See CIMC Vehicles Grp. Co. v. Direct Trailer, LP*, No. H-10-709, 2012 WL 4017985, at *9 (S.D. Tex. Aug. 24, 2012), *report and recommendation adopted* by 2012 WL 4018200 (S.D. Tex. Sept. 12, 2012) ("By uniformly relying on Texas law, the parties agree that it applies to their controversy. Absent any indication in the record that any other law should apply, the court applies Texas law.").  Thus, in determining whether the parties formed a valid contract, the Court applies Texas law.

[4] Although Defendant's briefing contains scattered references to these arguments or semblances of them, the Court notes that Defendant's briefing provides little elaboration.  For example, while Defendant's briefing contains citation to some authorities, he often provides no discussion or argument of the cases cited beyond a quotation from the case of a general principle.  Nor does Defendant explain how the cases support his specific contentions.

Agreement may be withdrawn simply by notifying the judge that he/she cannot sign an 'Agreed Order,'" and, here, Defendant withdrew his consent (Dkt. #29 at p. 9).  In response, Plaintiff asserts that Defendant "makes an incorrect statement of the law" (Dkt. #32 at p. 7).  The Court agrees with Plaintiff.

Rule 11 agreements have long been recognized in Texas as "an effective tool for finalizing settlements by objective manifestation so that the agreements 'do not themselves become sources of controversy.'" *Knapp Med. Ctr. v. De La Garza*, 238 S.W.3d 767, 768 (Tex. 2007) (quoting *Kennedy v. Hyde*, 682 S.W.2d 525, 530 (Tex. 1984)).  Rule 11 requires settlement agreements to "be in writing, signed and filed with the papers as part of the record." TEX. R. CIV. P. 11. Importantly, a settlement agreement must comply with Rule 11 to be enforceable. *Knapp Med. Ctr.*, 238 S.W.3d at 768.  Here, while there is no dispute over whether the requirements of Rule 11 were met, Defendant argues that the Rule 11 Agreement at issue is not a contract because Rule 11 is a procedural rather than substantive rule (Dkt. #30 at p. 14).  Thus, according to Defendant, "[a] Rule 11 [agreement] is never an enforceable contract and may be unilaterally withdrawn for any reason prior to the judge accepting the stipulation for entry" (Dkt. #30 at p. 14).

However, Defendant's argument is misplaced—that the parties styled their agreement as a Rule 11 Agreement does not mean the document cannot be an enforceable contract.  Indeed, "[c]ourts construe Rule 11 settlement agreements just as they would any contract." *MKM Eng'rs, Inc. v. Guzder*, 476 S.W.3d 770, 778 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citing *Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex. 1995)).  To be sure, Defendant's argument "confuse[s] the requirements for an agreed judgment with those for an enforceable settlement agreement." *Padilla*, 907 S.W.2d at 461.  In *Padilla*, in rejecting a similar argument to Defendant's, the Supreme Court of Texas stated:

9

> Although a court cannot render a valid agreed judgment absent consent at the time
> it is rendered, this does not preclude the court, after proper notice and hearing, from
> enforcing a settlement agreement complying with Rule 11 even though one side no
> longer consents to the settlement. The judgment in the latter case is not an agreed
> judgment, but rather is a judgment enforcing a binding contract.

*Id.*  Thus, contrary to Defendant's argument, a written settlement agreement may be enforced

though one party withdraws consent before judgment is rendered on the agreement. *Id.*; *see also*

*Mantas v. Fifth Court of Appeals*, 925 S.W.2d 656, 658 (Tex. 1996).  However, as the Texas

Supreme Court has explained, where consent is lacking, a court may not render an agreed judgment

on the settlement agreement but may enforce it only as a written contract. *Padilla*, 907 S.W.2d at

461.  As such, even if Rule 11 is a procedural rule, the Rule 11 Agreement may be enforced as a

contract so long as it satisfies all of the elements of a valid contract. *See id.* at 460; *see also Exp.*

*Worldwide, Ltd. v. Knight,* No. SA–05–CA–647, 2007 WL 628746, at *5 (W.D. Tex. Feb. 27,

2007).

Nevertheless, while Rule 11 is a minimum requirement for enforcement of all settlement

agreements, it is not exclusive, and other law may provide additional requirements before an

agreement is enforceable. *See Kennedy*, 682 S.W.2d at 529.  As such, when examining settlement

agreements, courts employ the same procedures used to enforce other contracts, interpreting them

under ordinary contract interpretation principles. *Odom v. Southcross Sec., Inc.*, No. 01-17-00915-

CV, 2018 WL 2925709, at *1 (Tex. App.—Houston [1st Dist.] June 12, 2018, no pet.); *see also*

TEX. CIV. PRAC. & REM. CODE § 154.071(a) ("If the parties reach a settlement and execute a written

agreement disposing of the dispute, the agreement is enforceable in the same manner as any other

written contract.").

With this issue resolved, the Court turns to consider Defendant's next argument—that the

Rule 11 Agreement is not an enforceable contract because the parties did not intend for it to be.

10

### B. The Parties' Intent to be Bound

Courts construe Rule 11 settlement agreements just as they would any contract.[5] *Guzder*, 476 S.W.3d at 778; *see also Padilla*, 907 S.W.2d at 460–61.  The intent of the parties to be bound is an essential element of an enforceable contract. *Guzder*, 476 S.W.3d at 778; *see also Foreca, S.A. v. GRD Dev. Co*., 758 S.W.2d 744, 746 (Tex. 1988). A Rule 11 settlement agreement also must contain all the essential terms of the settlement. *Padilla*, 907 S.W.2d at 460.

When interpreting a contract, courts "look to the language of the parties' agreement." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc*., 590 S.W.3d 471, 479 (Tex. 2019).  It is fundamental that courts  "may neither rewrite the parties' contract nor add to its language." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003).  Nor may courts "consider only the parts favoring one party and disregard the remainder." *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005).  Instead, "[w]hen discerning the contracting parties' intent, courts must examine the entire agreement and give effect to each provision so that none is rendered meaningless." *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (quoting *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)).  If the language in a contact can be given a definite or certain legal meaning, then courts construe the contract as a matter of law. *Barrow-Shaver*, 590 S.W.3d at 479.  But if, after the rules of construction are applied, the contractual language is susceptible to two or more reasonable interpretations, then the contract is ambiguous, creating a fact issue as to the parties' intent. *Id*.  Only if a contract is ambiguous may courts consider the

---

[5] The Court notes that where no material facts concerning the existence of an agreement are in dispute, the entry of an order without a hearing is permissible. *Lee v. Hunt*, 631 F.2d 1171, 1177 (5th Cir. 1980); *see also Borden v. Banacom Mfg. and Mktg., Inc*. 698 F. Supp. 121, 123 n.1 (N.D. Tex. 1988).  Here, there is no dispute over whether the parties reached a written agreement at mediation.  However, what is in dispute is whether the parties intended to be presently bound by the Rule 11 Agreement and whether the Rule 11 Agreement included all essential terms.

parties' interpretations and admit extraneous evidence to prove the true meaning of the contractual language. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008) (per curiam).

Here, the parties dispute whether the Rule 11 Agreement was intended to be an enforceable contract or intended to serve merely as a preliminary, non-binding agreement.  On the one hand, Plaintiff argues that since "it was expressly agreed that [the Rule 11 Agreement] was complete and final," the intent to be bound was clear and unambiguous (Dkt. #23 at p. 8).  Further, according to Plaintiff, the FSA "was just a procedure to memorialize the [Rule 11] [A]greement" (Dkt. #23 at p. 8).  Conversely, Defendant argues "[i]ntent is always a fact question," (Dkt. #30 at p. 12), and "[t]he wording of the Rule 11 [A]greement conclusively shows that it was never contemplated to be a contract" (Dkt. #29 at p. 10).

Parties may enter into a binding settlement agreement even if the parties contemplate that a more formal document memorializing the agreement will be executed at a later date. *See Foreca*, 758 S.W.2d at 745–46; *see also Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 555 (Tex. 1972) (stating that parties may agree upon certain contractual terms and leave other matters for later negotiation).  But if the parties do not intend to be bound until other terms are negotiated or until a formal document is executed, then there is no binding contract, but merely "an agreement to agree." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *Foreca*, 758 S.W.2d at 745–46.  Importantly, "[t]he critical issue for determining enforceability when the parties agree that some terms will remain open is whether the parties intended for their agreement to be a present, binding agreement in the absence of an agreement on the remaining terms or whether they intended their agreement to have no legal significance until agreement on the remaining terms is reached." *Guzder*, 476 S.W. 3d at 779; *see also Martin v. Black*, 909 S.W.2d 192, 196 (Tex. App.—Houston [14th Dist.] 1995, writ denied) (noting that whether settlement

agreement that is subject to additional documentation is binding is determined by intent of parties); *Border Gateway, L.L.C. v. Gomez*, No. 14-10-01266-CV, 2011 WL 4361485, at *3 (Tex. App.—Houston [14th Dist.] Sept. 20, 2011, no pet.) (stating that determination of whether mediation agreement is mere agreement to agree or binding obligation turns on "whether the parties intended for the contemplated formal writing to be a condition precedent to the formation of a contract, or merely a memorial of an already enforceable contract").

Although the intent of the parties to be bound is generally a question of fact, it may be determined as a matter of law where that intent is clear and unambiguous on the face of the agreement. *Foreca*, 758 S.W.2d at 746; *Hardman v. Dault*, 2 S.W.3d 378, 380 (Tex. App.—San Antonio 1999, no pet.). *Foreca* is the leading case on whether "intent to be bound" presents a fact question or a question of law. 758 S.W.2d at 744. In *Foreca*, the Supreme Court of Texas held that a handwritten document created a fact issue as to the parties' intentions because the document, although it included many essential terms, included the phrase "subject to legal documentation contract to be drafted by [one of the party's attorneys]." 758 S.W.2d at 745–46. The Court held that the language was ambiguous, and it was for the jury to resolve whether the document was intended to be the final expression of the contract or was only a preliminary negotiation which the parties did not intend to have legal significance until execution of the contemplated legal documentation. *Id.* at 746. Similarly, in *Martin v. Black*, a Texas appellate court, relying on *Foreca*, held that the phrase in a mediation term sheet "subject to securing documentation satisfactory to the parties" created a fact issue as to the parties' intentions. 909 S.W.2d at 197.

By contrast, in distinguishing the "subject to" language in *Foreca*, another Texas appellate court held that the phrase in a written settlement agreement "final documents to be signed by 1–1–97" did not create a fact issue as to the parties' intent because it was unambiguous that the parties

13

did not view the signing of future documents to be a condition precedent to creation of a binding contract. *Hardman*, 2 S.W.3d at 381. Thus, summary judgment enforcing the written the settlement agreement was proper. *Id.*  Similarly, in *Coastal Corp. v. Atlantic Richfield Co.*, 852 S.W.2d 714, 717 (Tex. App.—Corpus Christi 1993, no writ), a Texas appellate court found that no fact issue existed as to whether the parties intended for there to be a binding contract. *Id.*  In the case, a letter agreement for the sale of securities provided that "[n]othing in this Agreement shall be binding upon any of the parties until this Agreement is executed by all of the parties by their duly authorized officers." *Id.*  Thus, because the document memorializing the agreement expressly required it to be executed and the agreement was never executed, the court found "it [] clear that the [parties] did not consider themselves to have a contract." *Id.*

Here, viewing the Rule 11 Agreement as a whole, there is only one reasonable interpretation—that the parties intended for it to be a present, binding settlement agreement. *See Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) ("A contract's plain language controls, not 'what one side or the other alleges they intended to say but did not.'") (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010)).  To begin, the document was "expressly drafted as a Rule 11 Agreement—a recognized tool for finalizing settlements—presumably because the parties intended to settle their disputes by entering into an enforceable contract." *Guzder*, 476 S.W. 3d at 779.  Further, though parts of the Rule 11 Agreement are drafted in the future tense, the document contains no language indicating that it was merely intended as a preliminary, non-binding agreement. *See John Wood Grp. USA, Inc. v. ICO Inc.*, 26 S.W.3d 12, 19 (Tex. App.–Houston [1st Dist.] 2000, pet. denied) (cautioning that a party who does not wish to be prematurely bound by a letter agreement should include a provision clearly stating that the letter is nonbinding).

Nor does the Agreement provide that it is "subject to" a more formal agreement, contingent on agreement as to the terms of additional documents, or contain language indicating that certain actions are a condition precedent to the agreement's enforceability. *Cf. Foreca*, 758 S.W.2d at 745 (formal documentation was condition precedent to formation of contract when provision in document containing material terms for sale and purchase of amusement park rides provided that document was "subject to legal documentation contract to be drafted by [the attorney for one of the parties]"); *Border Gateway*, 2011 WL 4361485, at *3 (stating that "a condition precedent to contract formation is 'clearly' evidenced where an agreement unequivocally provides that a party does not intend to be bound until the execution of a final contract"); *Hardman*, 2 S.W.3d at 381 (noting absence of any "subject to" language in settlement agreement); *CherCo Props., Inc. v. Law, Snakard & Gambill, P.C.*, 985 S.W.2d 262, 266 (Tex. App.—Fort Worth 1999, no pet.) (observing that parties' written settlement agreement did not state that additional term was condition precedent to binding agreement).  Rather, the Rule 11 Agreement unambiguously states the opposite—that it is "intended to be a complete and final agreement" (Dkt. #29, Exhibit 12).  More specifically, section nine of the Agreement provides:

> This agreement is intended to be a complete and final agreement, although the FSA shall recite additional terms necessary to complete the Agreement. This Agreement is not subject to revocation by the Parties and is intended to be the basis for a final and binding settlement.

(Dkt. #29, Exhibit 12).  Thus, the clear and unambiguous language shows that the parties intended to enter into a binding settlement agreement—not a preliminary agreement.  Indeed, the enforceability of the Rule 11 Agreement was not made subject to agreement on the terms of the FSA.  Rather, though recognizing that the FSA shall "recite additional terms necessary to complete the Agreement," the Rule 11 Agreement nevertheless explicitly states that it is "intended to be a complete and final agreement" (Dkt. #29, Exhibit 12).

15

To be sure, this case is more like *Hardman* and *Coastal* than *Foreca* or *Martin*.  In *Coastal*, the language of the agreement was clear and unambiguous when it *specifically* stated that it would not be binding until it was executed.  *See Coastal Corp.*, 852 S.W.2d at 717 (noting that the agreement provided that "[n]othing in this Agreement shall be binding upon any of the parties until this Agreement is executed by all of the parties by their duly authorized officers").  Thus, because the document expressly required that it be executed before it was binding, the Texas appellate court found that there was no fact issue as to whether the parties intended for the agreement to binding.  Similarly, here, the Rule 11 Agreement is clear and unambiguous because it *specifically* states that it "is intended to be a complete and final agreement . . . is not subject to revocation by the Parties[,] and is intended to be the basis for a final and binding settlement" (Dkt. #29, Exhibit 12).  Thus, the language shows a clear and unambiguous intent for the Agreement to be presently binding.  Further, unlike *Foreca* and *Martin*, the Rule 11 Agreement does not contain any language that the Agreement is "subject to" a more formal agreement or conditioned on agreement as to terms of the additional documents. *Cf. Foreca*, 758 S.W.2d at 745; *Martin*, 909 S.W.2d at 197 *with Hardman*, 2 S.W.3d at 381; *see also Criswell v. European Crossroads Shopping Ctr., Ltd*., 792 S.W.2d 945, 948 (Tex. 1990) (noting that in construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible).

Thus, Defendant's attempt to overcome the clear and unambiguous language in section nine of the Agreement is unavailing.  Indeed, though the Rule 11 Agreement states that it "will be reduced to a Family Settlement Agreement" that "shall recite additional terms necessary to complete the Agreement," here, like *Hardman*, the mere fact that additional documents were to be created is not enough to create a fact issue as to whether the parties intended to be presently bound. *See Hardman*, 2 S.W.3d at 381; *see also MCRB I Ltd. v. Sw. Rail Indus., Inc*., No. 14–10–00922–

CV, 2011 WL 4031023, at *3–4 (Tex. App.—Houston [14th Dist.] Sept. 13, 2011, no pet.) (finding that agreement's reference to additional formal documents to be sent to the parties did not create a fact issue on whether the parties intended to be bound); *Guzder*, 476 S.W.3d at 779 (rejecting argument that because parties contemplated taking additional actions at a later date, there was a fact issue as to the parties' intent); *Watson v. Purvis*, No. 14-18-00132-CV, 2019 WL 2939816, at *3 (Tex. App.—Houston [14th Dist.] July 9, 2019, no pet.) (mem. op.) (finding no fact issue as to whether the parties intended their agreement to be a present, binding agreement even though agreement was "subject to final paperwork" and the parties left "additional provisions" to be possibly negotiated).

Rather, as case law makes clear, what is crucial is not the Agreement's mere reference to additional documents—but whether execution of the additional documents is characterized as a condition precedent to the formation of a binding settlement agreement. *See Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 749 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("Although the Rule 11 agreement read into the record contemplated execution of additional documents, this was not characterized as a condition requisite to the formation of a binding settlement agreement; indeed, the Rule 11 agreement does not include any language indicating that the parties had engaged only in preliminary negotiations or that their agreement was contingent on agreement as to the terms of the additional documents."). And, here, the Agreement does not contain any language indicating that final agreement is conditioned upon anything in the future. Instead, to belabor the point, the Rule 11 Agreement expressly states that it "is intended to be a complete and final agreement" and "not subject to revocation" (Dkt. #29, Exhibit 12).

Lastly, Defendant argues that the parties' continued negotiations after the Rule 11 Agreement's execution show that "at least a fact question exists whether the settlement was still

being negotiated" (Dkt. #30 at p. 14).  However, as the Rule 11 Agreement expressly contemplated an FSA, "working toward final settlement documents is exactly what the Rule 11 Agreement contemplated the parties would do." *Guzder*, 476 S.W. at 780.  Thus, the Court finds Defendant's argument regarding the parties' continued negotiations to be unpersuasive.  Moreover, the Court finds that other actions by Defendant in the days after execution of the Rule 11 Agreement undermine Defendant's argument on the matter.  For example, one day after the mediation, Kelsey's paralegal, on behalf of Kelsey, emailed the Probate Court that "[t]he parties settled their case yesterday in mediation . . . ." (Dkt. #23, Exhibit 3 at p. 9).  Further, in another email, though Kelsey recognized that "[t]he devil is in the details" and that "[t]he Rule 11 mediated settlement agreement is clearly a skeleton which anticipates the flesh and skin being added later[,]" Kelsey also stated: "I believe the Rule 11 MSA is complete to the point that no one can substantively back off from the agreement" (Dkt. #23, Exhibit 3 at pp. 6–7).  Thus, immediately after the Rule 11 Agreement was signed, Defendant's counsel behaved as though the Rule 11 Agreement was binding. *See Stergiou*, 438 S.W.3d at 750.

In sum, the Court finds that the Rule 11 Agreement unambiguously shows that the parties intended for it to be presently binding.  In other words, neither the language of the Rule 11 Agreement, nor the actions of the parties after the Agreement raises an issue of fact about the parties' intent to be bound.  The Court turns to consider the parties' next point of disagreement— whether the Rule 11 Agreement contains all of the material and essential terms to be enforceable.

### C.   Whether the Rule 11 Agreement Contains All of the Essential and Material Terms

"To be enforceable, a contract must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (internal quotations and citations omitted).  More specifically, an agreement's

18

essential terms must be sufficiently definite "to enable a court to understand the party's obligations" and "to give an appropriate remedy if they are breached." *Id*. (internal quotations and citations omitted). Generally, under Texas law, "material and essential terms are those that parties would reasonably regard as 'vitally important ingredient[s]' of their bargain." *Id*. (quoting *Neeley v. Bankers Tr. Co*., 757 F.2d 621, 628 (5th Cir. 1985)). However, contracts should be examined on a case-by-case basis to determine which terms are material or essential. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). While Texas courts favor validating transactions rather than voiding them, "a court may not create a contract where none exists and generally may not add, alter, or eliminate essential terms." *Stergiou*, 438 S.W.3d at 745. The question of whether a settlement agreement contains all the essential terms for it to be enforceable is a question of law. *See McCalla v. Baker's Campground, Inc*., 416 S.W.3d 416, 418 (Tex. 2013) (per curiam).

Here, Plaintiff contends that the Rule 11 Agreement contains all of  the essential terms because it "provide[s] payment of funds and the release of certain property by the Plaintiff" in return for Defendant "consenting to the appointment of [Plaintiff] as Independent Administrator and the mutual release of claims" (Dkt. #32 at p. 5). In response, Defendant asserts that the Rule 11 Agreement is "incomplete" and contains no "meeting of the minds[,]" specifically noting that the Rule 11 Agreement contains no mention on "how and when the bilateral 'consideration' was to be paid or exchanged" (Dkt. #30 at p. 12).

As an initial matter, Texas courts have long "held that the essential terms for a settlement agreement are the amount of compensation and the liability to be released." *Chowning v. Boyer*, No. 03-20-00387-CV, 2021 WL 3233859, at *6 (Tex. App.—Austin July 30, 2021, no pet.) (collecting cases); *see, e.g.*, *Guzder*, 476 S.W.3d at 782 (concluding that Rule 11 agreement

contained all material terms because it contained payment terms and a statement that the parties will exchange mutual releases); s*ee Padilla*, 907 S.W.2d at 460-61 (finding all material terms of the agreement existed where terms included agreement to pay amount in exchange "for full and final settlement of this case"); *Cantu v. Moore*, 90 S.W.3d 821, 825 (Tex. App.—San Antonio 2002, pet. denied) (holding that settlement agreement contained all material terms when one party agreed to pay other party $150,000 and all parties agreed to execute full releases though agreement did not contain the source of the funds from which the settlement was to be paid and the terms of the indemnity); *CherCo Props., Inc.*, 985 S.W.2d at 266 (holding that settlement agreement that included payment terms and statement that parties would execute mutual releases contained all material terms and finding that a time for performance was not a material term).  Nevertheless, the parties dispute whether several essential terms are either too indefinite or missing from the Rule 11 Agreement, rendering it unenforceable.  And, more importantly, contracts are reviewed on a case-by-case basis. *See Barrow-Shaver*, 590 S.W.3d at 479; *Fischer*, 479 S.W.3d at 237.

Turning to the parties' Rule 11 Agreement, it provides, in relevant part, that (1) Young will pay the Ershicks $5,000, deliver certain personal property items to the Ershicks at Sugar Mill Lane, and make the 1979 Chevrolet Camaro available for pickup at Sugar Mill Lane, as well as transfer title of the Camaro no sooner than when the FSA is approved by the Court; (2) the Ershicks will make no further claim to any property of Decedent's estate or property otherwise in possession of Decedent including the real property at Sugar Mill Lane, stipulate that the real property on Sugar Mill Lane is awarded to Young in its entirety, and stipulate in the FSA that they are in agreement to allow Plaintiff to be the independent administrator and shall not oppose any bond; and (3) that the parties will execute a global release of the other parties and execute all documents to affect the terms of the Agreement (Dkt. #29, Exhibit 12).

20

Thus, after examining the Rule 11 Agreement, the Court concludes that the parties agreed to all essential terms, including that Plaintiff would pay $5,000 and deliver certain property to the Ershicks in exchange for the Ershicks agreeing to make no further claim to any other property in possession of Decedent and consenting to the appointment of Plaintiff as Independent Administrator, as well as the parties' mutual release of claims. *See Guzder*, 476 S.W.3d at 778 ("Essential or material terms of a Rule 11 settlement agreement include payment terms and release of claims."); *see also Watson*, 2019 WL 2939816, at *3 (finding settlement agreement included essential terms where it provided one party would pay the other party monthly payments of $2,500 and return certain personal property and that the parties would enter general mutual releases). Moreover, if Defendant was correct in his assertion that the Rule 11 Agreement lacks essential terms, then the agreement would be unenforceable, which would result in the disfavored outcome of complete forfeiture. *Fischer*, 479 S.W.3d at 239 (noting that courts should find the terms to be sufficiently definite when the language is reasonably susceptible to that interpretation because the law disfavors forfeitures).

Though the Rule 11 Agreement does not resolve the details as to when the exchanges would take place, the methodology for the pickup up of the property, or the details of the mutual releases, agreement as to these collateral matters is not fatal. *See E.P. Towne Ctr. Partners, L.P. v. Chopsticks, Inc.*, 242 S.W.3d 117, 123 (Tex. App.—El Paso 2007, no pet.) (holding that parties entered into binding settlement agreement even though agreement did not address disposition of tenant's security deposit or date to vacate premises—terms which "may have been significant to the parties' relationship"—because those terms were unessential "collateral matters"); *see also In re Deepwater Horizon*, 786 F.3d 354, 357 n.26 (5th Cir. 2015) (collecting cases holding that even when the existence of a release is material, the precise terms and specific language of the releases

are not material).   First, as to the timing of performance, "Texas courts hold that time of performance such as the time of payment of a settlement amount is not an essential term because time ordinarily is not of the essence in a contract." *Love v. Harrison*, No. 14-16-00632-CV, 2017 WL 3567868, at *6 (Tex. App.—Houston [14th Dist.] Aug. 17, 2017, no pet.) (collecting cases); *see CherCo Props., Inc.*, 985 S.W.2d at 266 (finding that time of performance in settlement agreement was not a material term); *see also Fischer*, 479 S.W.3d at 239 (noting that courts often imply a term setting reasonable time of payment).

Further, as with time of performance, Texas courts routinely hold that the manner of payment and performance are not essential terms. *See Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 827 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (rejecting argument that that time and manner of performance were material terms of parties' agreement); *Eastman Gas Co., L.L.C. v. Goodrich Petroleum Co., L.L.C.*, 456 S.W.3d 319, 329 (Tex. App.–Texarkana 2015, pet. denied) ("[T]he manner of payment and the amount and rate of interest are not essential terms [of the Rule 11 agreement].").   Thus, though Defendant points out that the parties failed to agree on "how and when the bilateral 'consideration' was to be paid or exchanged[,]" the lack of agreement on these terms does not render the agreement unenforceable.   To be sure, these are the only two terms that Defendant points to that are missing from the Rule 11 Agreement.   However, enforceable settlement agreements need only "contain sufficient terms to determine the parties' obligations but [are] not required to resolve all disputed issues." *W. Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 258–59 (Tex. App.—Austin 2002, no pet.).   Thus, the Court finds that the Rule 11 Agreement contains all essential terms.

**D. Whether the Rule 11 Agreement Fails for Indefiniteness Because It Leaves Terms to be Agreed Upon by the FSA**

Relatedly, Defendant argues that the Rule 11 Agreement is unenforceable because it contemplates terms to be agreed upon by the FSA—terms that were never agreed to.  Thus, because the parties could not agree on the additional terms and a court cannot supply terms not agreed upon, Defendant hints that the agreement is impossible to enforce.  However, "the fact that the parties have left certain terms open for negotiation in an agreement that they intend to be binding does not make the agreement indefinite." *Stergiou*, 438 S.W.3d at 752.  Accordingly, that the Rule 11 Agreement contemplates the execution of an FSA at a later date and leave other terms open to be agreed upon later does not preclude its enforcement. *See id.* at 751-52 (rejecting argument that Rule 11 Agreement could not be enforced because the parties could not agree on the additional documents' terms).  Indeed, "[c]ourts often enforce settlement agreements that contemplate additional documentation or leave other terms open to be agreed upon later." *Jennings v. Jennings*, 625 S.W.3d 854, 862–63 (Tex. App.—San Antonio 2021, pet. filed) (collecting cases).

To be sure, "[a]greements to enter into future contracts are enforceable if they contain all material terms." *McCalla*, 416 S.W.3d at 418 (per curiam).  When an "agreement to enter into a future contract already contains all the material terms of the future contract," courts can determine and enforce the parties' obligations, and concerns about indefiniteness and reasonable certainty do not arise. *Id.*  Accordingly, an agreement that contains all of its essential terms is not unenforceable merely because the parties anticipate some future agreement. *See id.* (holding that even if settlement agreement in which party promised that he "will agree" and "agree[s] to enter an agreement" constituted "agreement to agree," it was nevertheless enforceable because it contained all material terms).  Thus, a binding settlement may exist when parties agree upon some terms,

understanding them to be an agreement, and leave other terms to be made later. *See, e.g., Foreca*, 758 S.W.2d at 746; *Stergiou*, 438 S.W.3d at 744.

For example, in *Martin v. Martin*, 326 S.W.3d 741 (Tex. App.—Texarkana 2010, pet. denied), two brothers had a dispute over the management of their closely-held corporation. *Id*. at 743.  In an effort to settle their dispute over "corporate control," the brothers reached a settlement agreement that, among other things, required them to negotiate a shareholder agreement in good faith. *Id*. at 743–44.  However, they never agreed to the terms of the shareholder agreement. *Id.* at 744.  On appeal, the Texas appellate court concluded that their settlement agreement was not an enforceable agreement because the to-be-negotiated shareholder agreement "would be the foundational document of [the company] and would define the [brothers'] rights vis-a-vis each other and [the company]." *Id*. at 754.  Thus, because the settlement agreement left the terms of the shareholder agreement open for future agreement that never occurred, the court found that the settlement agreement was unenforceable as a matter of law. *Id*.

Conversely, in *Stergiou*, another Texas appellate court found that a Rule 11 agreement was enforceable as a matter of law though the Rule 11 agreement contemplated additional documents to be executed and failed to supply information as to the specific terms of the additional documents. 438 S.W.3d at 743.  In distinguishing *Martin*, the court found that that "the additional documents d[id] not have the same 'foundational' importance to the underlying dispute." *Id*. at 746.  After noting the essence of the parties' agreement was the promise to pay $300,000 in exchange for the return of stock and the dismissal of the lawsuit, the court found that the additional documents, which would have included provisions relating to inspection rights, insurance, prepayment of debt, and repair of collateral, were not "vitally important elements of their bargain." *Id*.  Further, though acknowledging that the Rule 11 agreement required one party to make installment payments for a

24

number of years to the other party, the Court found that the Rule 11 agreement did not require the parties to have a relationship "akin to the parties in *Martin*, who continued to be involved in the operation of the same closely-held corporation." *Id.*  Thus, the court found that the terms of the additional documents were not essential. *Id.* at 747.

Here, the Rule 11 Agreement's contemplation of the execution of the FSA is more like the contemplation of additional documentation in *Stergiou* than *Martin*.  Like *Stergiou*, here, the additional document contemplated by the Rule 11 Agreement—the FSA—relates to details regarding implementation of the Rule 11 Agreement.  Indeed, like *Stergiou*, the Rule 11 Agreement sets forth the general terms of the parties' settlement—including payment obligations and the release of claims. *See* 438 S.W.3d at 756.  And like *Stergiou*, where the terms in the additional documents that were never agreed to related to payment and were found to be non-essential, here, the terms relate to the details of performance and timing and are non-essential.  *See id*. Further, unlike *Martin*, where the shareholder agreement was contemplated to be the foundational document of the settlement agreement, here, the FSA was simply intended to "recite additional terms necessary to complete the Agreement" *Cf. Martin*, 326 S.W.3d at 754 *with* Dkt. #29, Exhibit 12.

In sum, the Court finds that the Rule 11 Agreement contains all the essential terms with enough definiteness to be enforceable.  The Court turns to Defendant's last argument as to why the Rule 11 Agreement is not a valid contract.

### E.  Whether the Rule 11 Agreement Fails for Mutuality of Obligation

Defendant's briefing makes a few scattered references to the idea that Plaintiff's promises were illusory (Dkt. #30 at p. 12; Dkt. #34 at p. 4).  For example, Defendant asserts: "Note the wording in the FSA which hedged Plaintiff's obligation by tying performance to the 'approval' by

the probate court judge and other factors solely under Plaintiff's control" (Dkt. #30 at p. 12).  In response, Plaintiff argues that the "Rule 11 Agreement provided consideration on both sides—that is a release of claims and the payment of money" and "[t]hat is all that is required" (Dkt. #31 at p. 4).  The Court finds Defendant's argument to be misplaced.

To be enforceable, a contract must be based on consideration, also known as mutuality of obligation. *See Tex. Gas Utils. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970).  Consideration is a present exchange bargained for in return for a promise and consists of benefits and detriments to the contracting parties. *Roark v. Stallworth Oil & Gas, Inc*., 813 S.W.2d 492, 496 (Tex. 1991). The detriments must induce the parties to make the promises, and the promises must induce the parties to incur the detriments. *Id.*  What constitutes consideration is a question of law. *Brownwood Ross Co. v. Maverick Cnty*., 936 S.W.2d 42, 45 (Tex. App.—San Antonio 1996, writ denied). Courts strive to construe a contract to promote mutuality and to avoid a construction that makes promises illusory. *Young v. Neatherlin*, 102 S.W.3d 415, 420 (Tex. App.—Houston [14th Dist.] 2003, no pet.).  However, a promise is illusory if it does not bind the promisor, such as when the promisor retains the option to discontinue performance. *In re 24R, Inc*., 324 S.W.3d 564, 567 (Tex. 2010).

Thus, lack of consideration occurs when the contract, at its inception, does not impose obligations on both parties. *Burges v. Mosley*, 304 S.W.3d 623, 628 (Tex. App.—Tyler 2010, no pet.).  The contract lacks mutuality of obligation and is unenforceable. *Id.*  Here, the Court finds that Plaintiff's promises were not illusory, but were supported by consideration.  For example, under the terms of the Rule 11 Agreement, Plaintiff agreed to pay $5,000 and deliver certain personal property to the Ershicks in exchange for their release of other claims to any property of the estate (Dkt. #29, Exhibit 12).

26

Moreover, per section nine of the Agreement, it was "not subject to revocation" by either party (Dkt. #29, Exhibit 12).  Thus, if Plaintiff's promise was illusory and she could unilaterally revoke some of her obligations, as Defendant contends, the Agreement's revocation provision would be rendered superfluous. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983) (readings that render phrases meaningless are disfavored).  Accordingly, because the Rule 11 Agreement does not give Plaintiff  the unilateral power to terminate the Agreement, it is not illusory.

In sum, the Court finds Defendant's arguments as to validity of the Rule 11 Agreement are unavailing.  Stated differently, the Court finds that the parties formed a valid contract when they entered the Rule 11 Agreement.  Nonetheless, Defendant argues that his pleading of fraudulent concealment as an affirmative defense prevents summary judgment for Plaintiff (Dkt. #30 at p. 10).  Accordingly, the Court turns to consider the effect of Defendant's fraudulent concealment defense.[6]

## II.      Fraud by Non-Disclosure

Fraud by non-disclosure is a subcategory of fraud that occurs when a party has a duty to disclose certain information and fails to disclose it. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219 (Tex. 2019).  To establish fraud by non-disclosure, the plaintiff must show:

> (1) the defendant failed to disclose material facts to the plaintiff that the defendant had a duty to disclose; (2) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts; (3) the defendant was deliberately silent when the defendant had a duty to speak; (4) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting; (5) the plaintiff relied on the defendant's

---

[6] Defendant alleges in his answer and re-affirms in his briefing that he "has pleaded fraudulent concealment which allows Defendant to rescind his Rule 11 Agreement" (Dkt. #29 at p. 11).  "Fraudulent concealment," however "is a defense to the statute of limitations." *Stabilis Fund II, LLC v. Compass Bank*, No. 3:18-CV-0283-B, 2020 WL 487497, at *6 n.2 (N.D. Tex. Jan. 30, 2020) (citing *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 67 (Tex. 2011)). Accordingly, because Defendant also discusses fraud by non-disclosure and cites cases regarding fraud by non-disclosure, the Court assumes that Defendant meant fraud by nondisclosure.

nondisclosure; and (6) the plaintiff was injured as a result of acting without that knowledge.

*D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 218 (5th Cir. 2018) (quoting *White v. Zhou Pei*, 452 S.W.3d 527, 537 (Tex. App.—Houston [14th Dist.] 2014, no pet.)).  Importantly, "for there to be actionable nondisclosure fraud, there must be a duty to disclose." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008) (quoting *Newby v. Enron Corp.*, 388 F. Supp. 2d 780, 788 (S.D. Tex. 2005)); *Bradford v. Vento*, 48 S.W.3d 749, 755–56 (Tex. 2001) ("[F]ailure to disclose information does not constitute fraud unless there is a duty to disclose the information").

Here, Defendant argues that though Plaintiff was under an affirmative duty to reveal the PMA, yet Plaintiff and Chowins fraudulently concealed it, "which allows Defendant to rescind his Rule 11 Agreement" (Dkt. #29 at p. 11; Dkt. #34 at p. 9).  Indeed, Defendant argues that "[t]hough [he] tried on multiple occasions to discover the PMA, [] Plaintiff and her attorney simply stonewalled and ignored Plaintiff's duty to Defendant and the duty of candor to the court" (Dkt. #29 at p. 12).  More specifically, according to Defendant, "the proof is [in] Plaintiff's own words in her deposition taken on August 31, 2021," (Dkt. #29 at p. 11), where "she lies about the existence of the PMA" (Dkt. #33 at p. 3).  Further, "to evidence Plaintiff's duplicity," Defendant points to Request for Production No. 23, "which specifically asks for any 'premarital agreement'" and "Plaintiff's lack of response" (Dkt. #33 at pp. 2–3).

In response, Plaintiff argues that "Defendant's poorly drafted discovery definitions, requests and questions at the Deposition [] never placed Plaintiff under an obligation to disclose the premarital agreement" (Dkt. #31 at p. 2).  According to Plaintiff, "[a]t the time of this discovery, [under the Texas Rules of Civil Procedure], there was no duty of automatic disclosure of relevant documents and Plaintiff only was required to respond to discovery as asked" (Dkt. #31 at p. 2).  Further, according to Plaintiff, because "Defendant limited the time period of requested

documents, Plaintiff was not required to volunteer documents outside of those parameters" (Dkt. #31 at pp. 2-3).  Moreover, "[t]here was no misrepresentation by Plaintiff—she acknowledged that there was a premarital agreement [at her deposition]" (Dkt. #32 at p. 12).

Thus, the crux of the parties' dispute is whether Plaintiff had a duty to disclose the PMA. While Defendant argues Plaintiff was under an affirmative duty to reveal the PMA, Plaintiff argues the PMA was never properly requested, which would have triggered the duty to disclose it. Importantly, if there was no legal duty to disclose the PMA, then there can be no fraud for failing to disclose it. *See Natour v. Bank of Am., N.A.*, No. 4:21-CV-00331, 2022 WL 2252588, at *3 ("[A] mere failure to disclose information does not constitute fraud unless there is a duty to disclose such information.").

### A. Whether a Duty to Disclose Existed

Whether a duty to disclose exists is a question of law for the court. *Bradford*, 48 S.W.3d at 755.  Under Texas law, a duty to disclose may arise in four situations. *Bombardier Aerospace Corp.*, 572 S.W.3d at 220.  First, if the parties have a confidential or fiduciary relationship, there may be a duty to disclose.[7] *Id*.  Second, a person may assume a duty to disclose when he or she voluntarily discloses partial information but fails to disclose the whole truth. *Id*.  Third, a duty to disclose arises when a person makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue. *Id*. Finally, a duty to disclose arises when a person's partial disclosure conveys a false impression. *Id*.

---

[7] A fiduciary duty arises "as a matter of law in certain formal relationships, including attorney-client, partnership, and trustee relationships." *Ins. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) (citations omitted).  A confidential relationship is one in which the "parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest." *Id*.; *see also Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) (per curiam) (recognizing that an informal relationship giving rise to a duty may also be created by a "special relationship of trust and confidence [which] exist[s] prior to, and apart from, the agreement") (citation omitted).  An informal relationship giving rise to a duty may also be formed from "a moral, social, domestic or purely personal relationship of trust and confidence." *Meyer*, 167 S.W.3d at 331 (citation omitted).

Here, though Defendant cursorily argues that "Plaintiff was under an affirmative duty to reveal the PMA before inducing an agreement," he fails to elaborate any further on the legal basis for his argument (Dkt. #34 at p. 9).  Indeed, he does not discuss—or even mention—which situation the duty to disclose arose from in this case—namely, whether it was from (1) the existence of a fiduciary relationship, (2) the Plaintiff's disclosure of partial information, (3) the Plaintiff's failure to disclose new information after making a representation, or (4) the Plaintiff's partial disclosure, which conveyed a false impression.  Further, though he cites three cases for the proposition that Plaintiff was under an affirmative duty to disclose the PMA, these cases offer no support for Defendant's position or any guidance on the matter.

Nevertheless, though failing to produce any legal authority to support his contentions, Defendant points to two specific instances that triggered the duty to disclose the PMA—(1) Defendant's discovery requests to Plaintiff and (2) Plaintiff's deposition.  However, the Court disagrees with Defendant.  First, the discovery requests served upon Plaintiff established no duty to disclose the PMA for several reasons.  To begin, as Plaintiff notes, at the time of the discovery, in contrast to the Federal Rules of Civil Procedure, the Texas Rules of Civil Procedure did not require the automatic disclosure of relevant documents. *See Matter of Smith*, No. 01-19-00014-CV, 2020 WL 5269417, at *4 (Tex. App.—Houston [1st Dist.] Sept. 3, 2020, no pet.) (mem. op.) ("The comments to Rule 194 indicate that "[d]isclosure is designed to afford parties basic discovery of specific categories of information, *not automatically in every case*, *but upon request*[.]") (citing TEX. R. CIV. P. 194 cmt. 1) (emphasis in original).  Further, though Defendant points to two specific discovery requests and suggests they required Plaintiff to produce the PMA, the Court disagrees (*See* Dkt. #33 at p. 2).

For example, Defendant points to Interrogatory 3, which provided:

3. Have you ever created or provided information to be recorded in any document/media regarding your marital status (e.g. W-4, W-9, tax returns, employment application, insurance application, property information, medical forms or histories, jury questionnaires, real estate documents, mortgage documents, bank records, stock brokerage records, investment accounts, title documents (e.g. automobile title, automobile purchase or sale, land purchase and sales of personal property), general contracts, conveyance documents (e.g. bill of sale), church documents, social media, etc.)? If so, please describe said document, date or approximate date of documents, and state what marital status you recorded on each such document

(Dkt. #32, Exhibit 1 at p. 26).   Significantly, however, the instructions to the interrogatories

provided: "Unless otherwise specified, please provide information which is current at the time you

are answering these interrogatories, *or from date of marriage to Decedent to the current date*"

(Dkt. #32, Exhibit 1 at p. 24) (emphasis added).

Chowins responded:

GENERAL OBJECTIONS: Except where Applicant responded to the specific interrogatory without objection, Applicant, Linda Young hereby OBJECTS to the "Contestants' Interrogatories to Applicant" on the grounds that the Discovery sought is overbroad and not reasonably tailored to include only matters relevant to the case before the court. Further, such discovery amounts to an impermissible "fishing expedition." The Applicant further states that the discovery sought amounts to impermissible annoyance and harassment of Applicant by the Contestants and an invasion of her personal, constitutional and property rights including her rights to privacy as to matters not before the Court. Furthermore, the probative value of the information sought is outweighed by the time and expense burden on the Applicant given the needs of this case.

OBJECTIONS: Applicant reiterates her General Objections and further objects to this interrogatory as overly broad and not reasonably tailored to include only matters relevant to the case. The applicant further objects to this interrogatory as vague as to the meaning of "information to be recorded in any document/media", and not relevant to any matter before the court nor reasonably calculated to lead to discovery of information relevant to any matter before this court. Without waiving these objections, Applicant responds as follows:

RESPONSE: Yes. Since the date of my marriage to Decedent through the Decedent's death, I have only represented my marital status as married. As such, there are too many documents to reasonably identify in response to this request given the length of our marriage. However, all federal tax returns filed during my marriage to Decedent were filed using a filing status available to married persons

31

(Dkt. #32, Exhibit 1 at pp. 27–28). Similarly, as to the second discovery request that Defendant points to, Request for Production No. 23, it stated:

> Provide a copy of all estate planning documents (e.g. wills, powers of attorney, directive to physicians, health care power of attorney, designation of agent, trusts, bank signature cards, survivorship agreements, marital or premarital agreements, etc.) *made or executed from date of marriage to date of death by either you or Decedent*

(Dkt. #32, Exhibit 1 at p. 34) (emphasis added). Plaintiff's Objections and Response provided:

> OBJECTIONS: Applicant reiterates her General Objections and further objects to this request as overly broad and not reasonably tailored to include only matters before the court.

> RESPONSE: Without waiving these objections, Applicant responds as follows: No responsive documents.

(Dkt. #32, Exhibit 1 at p. 36).

Thus, upon review of Defendant's specific discovery requests and Plaintiff's responses, Defendant is mistaken that a duty to disclose the PMA arose from them. As to the interrogatory request, the PMA neither fell within the requested document examples nor fell within the time parameters of the request as provided in the instructions to the request. Similarly, as to the request for production, though it specifically lists a premarital agreement as an example of a responsive document, it also clearly restricts the request to documents made or executed from the date of marriage to date of death. Thus, because of the date restriction within the request, the PMA, which was signed *prior* to the date of marriage, was not responsive to the request. Accordingly, Defendant's discovery requests and Plaintiff's responses did not create a situation in which a duty to disclose the PMA arose.[8]

---

[8] However, the outcome would be different if the Federal Rules of Civil Procedure or the *current* Texas Rules of Civil Procedure, which were amended in 2021, had governed the parties' discovery process. In contrast to the previous version of Rule 194 of the Texas Rules of Civil Procedure, which imposed no mandatory disclosure requirement, Rule

Moreover, though Defendant argues that "Judge Jahn's orders belie Plaintiff's arguments," pointing out that the Denton County Probate Court ultimately found the PMA to be "relevant" and ordered that it be produced, this argument is misleading (*See* Dkt. #33 at p. 2).  As Chowins notes, the motions to compel filed before mediation did not directly concern production of the PMA and Kelsey did not file a motion specifically concerning production of the PMA until months after mediation (Dkt. #32, Exhibit 2 at p. 5).  And though the Probate Court ultimately found the PMA to be "relevant" and ordered that it be produced, the Court did not find that it was responsive to any discovery request or that there was any wrongdoing by Plaintiff (Dkt. #32, Exhibit 2 at p. 5).  Thus, the Court does not find it persuasive that the Probate Court ultimately ordered production of the PMA.

Second, Defendant argues that the duty to disclose the PMA arose from Plaintiff's deposition testimony, "wherein she lie[d] about the existence of the PMA" (Dkt. #33 at p. 3).  At Plaintiff's deposition taken on August 31, 2020, the following exchange took place:

Q. (BY MR. KELSEY): Okay. Do you - - Did you and Eric have a premarital agreement of any kind?

A. Yes, I guess you could say that. We - - we had this little rinky-dink thing that we printed off. And then we found out later that it was probably no good because we didn't go to a lawyer and have one drawn up and signed and notarized and all of that kind of good stuff, so . . .

Q. Do you still have a copy of that?

A. Probably.

Q. I asked for that, and I have never received it. Do you know why I haven't received it?

MR. CHOWINS: Objection, work product.

---

194 of the Texas Rules of Civil Procedure and Rule 26(a) of the Federal Rules of Civil Procedure both require the automatic disclosure of certain documents—namely documents that a party "may use to support its claims or defenses." *See* TEX. R. CIV. P. 194.2(b)(6); FED. R. CIV. P. 26(a)(1)(A)(ii).

> MR. KELSEY: Counsel, how is an existing document work product? Done prior - -
>
> MR. CHOWINS: You're - -
>
> MR. KELSEY: - - to - -
>
> MR. CHOWINS: - - assuming facts that - - that go into the impressions of the case.
>
> MR. KELSEY: And that's the only response you have to that question; is that correct?
>
> MR. CHOWINS: Objection, form, as well.
>
> MR. KELSEY: Okay. Please certify that, Madam Reporter."

(Dkt. #30, Exhibit 2 at p. 4).

Here, while Plaintiff arguably downplayed the significance of the PMA, she, in fact, admitted that it existed.  Thus, contrary to Defendant's argument, the Court does not find that "she lie[d] about the existence of the PMA" (*See* Dkt. #33 at p. 3).  Moreover, though Defendant suggests Chowins was complicit in the fraud by "ma[king] a frivolous objection" when Kelsey asked Plaintiff why he hadn't received the agreement, (Dkt. #29 at p. 12), a closer inspection of the exchange shows that Chowins only objected on "work product" grounds after Kelsey asked *why* the document had not been produced earlier.  Thus, the Court does not find any wrongdoing by Chowins or Plaintiff.

More importantly, though Kelsey asked Plaintiff why the PMA had not been produced, he failed to ask that it be produced. Similarly, while Kelsey certified the question concerning the PMA, he failed to request a hearing on the deposition question before the mediation in October. Indeed, according to Chowins, after Plaintiff's deposition, Kelsey "never requested the premarital agreement referred to in the deposition, either formally or informally, until months after the mediated Rule 11 Agreement was entered into" (Dkt. #32, Exhibit 2 at p. 4).  Nor does Plaintiff

dispute that he failed to follow up on the existence of the PMA or take any further action to obtain it in the time between Plaintiff's deposition on August 31, 2020 and the mediation on October 27, 2020—a period of almost two months (*see also* Dkt. #29, Exhibit 21).

In short, though Defendant attempts to blame Plaintiff for his failure to receive the PMA before the mediation, Defendant has no one to blame but his counsel.  Though Defendant's counsel had a useful tool at his disposable to obtain the PMA—discovery—he failed to wield it in an artful manner.   Indeed, because of the date restrictions in Defendant's poorly drafted discovery definitions and requests, Plaintiff was under no affirmative obligation to disclose the PMA—a document outside of Defendant's parameters.   And though now Defendant points the finger at Plaintiff, it should go without saying that litigation is an adversarial process.  "Parties must act to protect their own interest." *Matter of Marriage of Moncur*, 640 S.W.3d 309, 318 (Tex. App.— Houston [14th Dist.] 2022).   As such, when Defendant limited the time period of requested documents, Plaintiff was under no obligation to correct Defendant's mistake by producing documents that were not asked for. *See Richman Trs. v. Kutner*, 504 S.W.2d 539, 544 (Tex. Civ. App.—Dallas 1973, writ ref'd n.r.e.) (seller of strip shopping center had no duty to disclose facts about extent of insurance converge because buyer failed to make inquiry and discover such information); *Am. Marine Upholstery Co. v. Minsky*, 433 S.W.2d 717, 720 (Tex. Civ. App.— Eastland 1968, writ ref'd n.r.e.) (lessor had no duty to inform lessee of previous flooding because lessee failed to inquire about whether the creek had flooded).

Even more so, Defendant's counsel was alerted to the existence of the PMA almost two months before the mediation, but he did nothing to obtain the document in the meantime.  Indeed, he failed to ask that it be produced.  He failed to send supplemental discovery requests.  He failed to request a hearing on the deposition question.  He did not request to postpone the mediation.

Instead, with knowledge that a premarital agreement existed, Defendant and his counsel chose to forego the rest of the adversarial process and settle Defendant's claims based on whatever information was available to them at the time.[9]

Yet, though Defendant's counsel knowingly chose to roll the dice as to the uncertainty of the contents of the PMA at the time, Defendant now blames Plaintiff for failing to disclose it.  But Plaintiff acknowledged that there was a premarital agreement in her deposition.  It was Defendant's counsel who failed to take action to uncover the contents of the agreement or even wait and see how the Probate Court would rule on the previously filed motions to compel.  Again, though Defendant attempts to shift the blame to Plaintiff, he can only blame his counsel—he is the one who chose to settle Defendant's claims in reliance on incomplete information.  *See Advanced Multilevel Concepts, Inc. v. Bukstel*, No. 11-3718, 2014 WL 6907973, *7 (E.D. Pa. Dec. 9, 2014) (rejecting claim of fraud when party decided to settle his claims with full knowledge that discovery was ongoing, that additional evidence was likely be disclosed, and three pending motions to compel remained outstanding at the time of the settlement).  Indeed, "[g]iven the expertise of the participants, a party considering entering into the contract would be expected to discover and clarify th[e] information." *Pellegrini v. Cliffwood-Blue Moon Joint Venture, Inc.*, 115 S.W.3d 577, 580 (Tex. App.—Beaumont 2003, no pet.).  But Defendant's counsel did not.

---

[9] While Defendant's counsel was on notice that the PMA existed before mediation because Young's deposition took place months before, it is unclear whether Defendant himself—James Ershick—knew of the existence of the PMA at the time of mediation.  In his unsworn declaration, he states: "My wife and I would never have agreed to the Rule 11 Agreement if we had known of the PMA . . . ." (Dkt. #30, Exhibit 14 at p. 2).  Thus, from this statement, it appears Defendant had no knowledge whatsoever of the PMA.  However, even if this is true, a party is accountable for the acts and omissions of its counsel. *Pioneer Inv. Servs. Co. v. Brunswick Assoc. L.P.*, 507 U.S. 380, 396; *Silvercreek Mgmt., Inc. v. Banc of Am. Securities, LLC*, 534 F.3d 469, 472–73 (5th Cir. 2008); *see also Harris v. Boyd Tunica, Inc.*, 628 F.3d 237, 240 (5th Cir. 2010) (noting that a party is bound by acts of her lawyer).  Nevertheless, this issue goes beyond the scope of this motion.  What is relevant for this motion is that Plaintiff had no duty to disclose the PMA based on the facts presented.

36

For all of these reasons, Defendant has failed to establish Plaintiff had a duty to disclose the PMA.

Therefore, the Court finds that Defendant's fraud by non-disclosure defense cannot carry the day.  As such, because Defendant's defense fails as a matter of law and Plaintiff has proven that the Rule 11 Agreement was a valid, enforceable contract,  Plaintiff has proven the first element for her breach of contract claim.  The Court now turns to consider whether she has proven the remaining elements.

### III.    Whether Plaintiff Can Prevail On Her Breach of Contract Claim

Under Texas law, there are four elements for a breach of contract claim: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff as a result of the breach. *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.).  As noted, Plaintiff has proven the first element—that there was an enforceable contract between the parties.  As to the remaining elements, the parties devote little time in their briefs to discussing these.  Nevertheless, the Court finds that Plaintiff meets all of the elements on her breach of contract claim.

### A. Whether Plaintiff Performed and Defendant Breached the Contract

To begin, pursuant to section 10 of the Rule 11 Agreement, Plaintiff's attorney was obligated to "draft the initial Family Settlement Agreement draft" and the Ershicks' attorney was given "7 days to respond to the FSA draft" (Dkt. #29, Exhibit 12).  Moreover, both parties agreed to "execute all documents to affect the terms of this Agreement" (Dkt. #29, Exhibit 12).  In compliance with the Agreement, Chowins drafted the first draft of the FSA and emailed it to Kelsey for review (Dkt. #23, Exhibit 3 at p. 11).  Kelsey emailed back a revised FSA with

additional changes (Dkt. #23, Exhibit 3 at p. 22).  The email exchanges between Chowins and Kesley reveal that the parties disagreed as to how many days pickup of the personal property would take, what part of the Sugar Mill Lane house the Ershicks would have access to, and whether additional personal property items would be exchanged (Dkt. #23, Exhibit 3).

Defendant admits that he withdrew his consent to the Rule 11 Agreement via email dated November 17, 2020 (Dkt. #30, Exhibit 4; Dkt. #30 at p. 6).  And, on February 24, 2021, Chowins emailed Kelsey to notify him that Plaintiff would file a breach of contract action if the Ershicks did not perform their contractual obligations.  In the email, Chowins stated that the Ershicks had "failed to comply with their contractual obligations under the Rule 11 Agreement by . . . fail[ing] to execute any draft of the FSA contemplated by the Rule 11 Agreement even though several drafts ha[d] been presented to them" (Dkt. #23, Exhibit 3 at p. 58).  The next day, Kelsey responded to Chowins' email, affirming that Mr. Ershick had "reupdiated the Rule 11 Agreement" (Dkt. #30, Exhibit 5).

Thus, the conduct and communications of the parties after execution of the Rule 11 Agreement reveal that (1) Defendant breached the Rule 11 Agreement and (2) Plaintiff performed her obligations.  To begin, because the Rule 11 Agreement required Defendant to "execute all documents to affect the terms of this Agreement[,]" Defendant's failure to do so constituted a breach. *See Deutsche Bank Nat'l Tr. Co. v. Guerrero*, No. A-13-CV-513 LY, 2014 WL 12580037, at *8 (W.D. Tex. Oct. 7, 2014) (finding that where settlement agreement required defendant to execute documents necessary to carrying out the agreement, defendant's failure to do so was a breach).  Indeed, Defendant does not dispute this—he admits that he withdrew his consent to the Rule 11 Agreement via email on November 17, 2020 and further repudiated the Rule 11 Agreement by letter dated February 25, 2021 (Dkt. #30 at pp. 6–7).

Conversely, Plaintiff tendered performance under the Rule 11 Agreement by having her attorney draft the FSA, and she states that she "was ready, able and willing to perform every obligation required of her under both the Rule 11 Agreement and the FSA proposed" (Dkt. #23 at p. 8).  Moreover, though Plaintiff never tendered $5,000 to the Ershicks or delivered the property covered under the Rule 11 Agreement, this does not preclude her recovery since these obligations were not due under the Rule 11 Agreement until later.  Further, "[i]t is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004).  Thus, because Defendant failed to perform under the Rule 11 Agreement prior to the date any payment or delivery of personal property was due from Plaintiff, Plaintiff was excused from these obligations. *See Narvaez v. Wilshire Credit Corp.*, 757 F. Supp. 2d 621, 629 (N.D. Tex. 2010) (nonperformance of contract excused when performance is prevented by other party); *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (noting that prevention of performance by one party excuses performance by the other party).  Thus, the Court concludes that Defendant breached the Rule 11 Agreement, and Plaintiff's remaining performance was excused by Defendant's breach.

As set forth above, the final element necessary to establish a claim for breach of contract is that the plaintiff has suffered damages. *Prime Income Asset Mgmt. Inc. v. One Dallas Centre Assoc. LP*, 358 Fed. App'x. 569, 571 (5th Cir. 2009) (noting that to establish breach of contract claim under Texas law, plaintiff must prove damages to the plaintiff resulting from breach).  The Court turns to consider this issue.

## B. Damages

As a result of Defendant's breach of the Rule 11 Agreement, Plaintiff seeks (1) specific performance of the Rule 11 Agreement, (2) $133,410.20 as additional damages caused by the breach of contract, and (3) reasonable and necessary attorney's fees (Dkt. #23 at pp. 8–9). Defendant contests each request—though, as with most of his other arguments, citing little case law in support of his positions.  The Court considers the requests in turn.

### i.      Specific Performance of the Rule 11 Agreement

First, Plaintiff seeks an order requiring Defendant to:

> (1) stipulate to the probate court that he is in agreement to allow Ms. Young to be the independent administrator and to not oppose any bond amount suggested, including no bond; (2) to stipulate that Defendant will make no claim to any property of the estate except for the property described in Exhibit A of the Rule 11 agreement, the Camaro and $5,000.00; (3) to relinquish any claim to the real property located at 11122 Sugar Mill Lane, Frisco Texas and to stipulate that the home will be awarded to Linda Young in its entirety

(Dkt. #36 at p. 1).  Further, according to Defendant, "[a]n order from this court requiring Defendant to sign the Family Settlement Agreement . . . would supply all necessary terms and would allow the probate court to continue with its duties in administering the Estate" (Dkt. #36 at p. 1).  In response, Defendant asserts that "[t]his court must abstain from making orders in the probate court" (Dkt. #33 at p. 1).  According to Defendant, though "the only issue before this court is a plain breach of contract claim . . . Plaintiff would have this court order the probate court judge to render and enter a judgment on Plaintiff's appointment as Administratix, order a mutual release, . . . [and] deal with the effect of the Premarital Agreement" (Dkt. #33 at pp. 1–2).

Specific performance is an equitable remedy that may be awarded upon a showing of breach of contract. *Ifiesimama v. Haile*, 522 S.W.3d 675, 685 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *Stafford v. S. Vanity Mag., Inc.*, 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007,

pet. denied).  Specific performance is not a matter of right, but a matter committed to the discretion of the trial court. *Id.*  Notably, courts in Texas have held that "[s]pecific performance is an appropriate remedy for breach of a mediated settlement agreement." *Knight*, 2007 WL 628746, at *10.

To be entitled to specific performance, a party must plead and prove the following: (1) there is no adequate remedy at law; *see Woody v. J. Black's LP*, No. 03-15-00293-CV, 2016 WL 3677241 at *3 (Tex. App.—Austin July 7, 2016, no pet.) (mem. op.); *South Plains Switching, Ltd. v. BNSF Ry. Co.*, 255 S.W.3d 690, 703 (Tex. App.—Amarillo 2008, pet. denied) (holding it to be a "fundamental rule of equity that specific performance may not be granted unless it is shown there is no adequate remedy at law"); (2) a readiness to perform; *see Cozzens v. Barstow*, No. 03-97-00194-CV, 1998 WL 20721 at *1 (Tex. App.—Austin Jan. 23, 1997, no writ) (mem. op.) (holding "[p]roof of the plaintiff's readiness, willingness, and ability to perform the contract is an essential element of his cause of action for specific performance"); and (3) performance of other material contractual obligations by the party seeking specific performance or a pleading that performance would have been tendered but for the defendant's breach or repudiation. *See DiGiuseppe v. Lawler*, 269 S.W.3d 588, 594 (Tex. 2008) ("It is also a general rule of equity jurisprudence in Texas that a party must show that he has complied with his obligations under the contract to be entitled to specific performance.") *see also Jennings*, 625 S.W.3d at 867 ("If a defendant repudiates a contract, a plaintiff may be excused from tendering performance before filing suit.").

Here, Plaintiff has met these requirements (*See* Dkt. #23 at p. 3 ("Linda Young was ready, able, and willing to perform every obligation required of her under both the Rule 11 Agreement and the FSA proposed.")).  Indeed, Defendant does not dispute this—he makes no argument concerning whether Plaintiff has satisfied these requirements.  Instead, Plaintiff and Defendant

41

dispute the logistics of the specific performance order and its effect on the underlying probate matter in the Denton County Probate Court.  However, the Court finds Defendant's arguments on whether the Court can order specific performance to be unpersuasive.  To be sure, by ordering specific performance, the Court is not interfering in probate matters. It is simply enforcing the parties' Rule 11 Agreement by providing a remedy to Plaintiff on her breach of contract claim. This Court has the power to do this solely because the parties have sought the Court's aid to resolve the breach of contract dispute between the parties.  Indeed, a "court has no power to decree specific performance in any manner except in keeping with the terms of the agreement made by the parties." *Hubler v. Oshman*, 700 S.W.2d 694, 699 (Tex. App.–Corpus Christi 1985, no writ).

Consequently, because Plaintiff has elected specific performance as her remedy, the Court orders that the parties specifically perform the terms of the Rule 11 Agreement.  Though Plaintiff only requests an order of specific performance concerning Defendant's obligations, the Court finds that this would be improper. *See Woody*, 2016 WL 3677241, at *3 ("[A] court's order of specific performance of a contract must compel performance by both parties, rather than ordering only one party to specifically perform.") (collecting cases).

Accordingly, the Court finds that Defendant shall:

a.  Stipulate to the probate court that Plaintiff may be appointed the independent administrator and to not oppose any bond amount suggested, including no bond;

b.  Execute a global release of Plaintiff;

c.  Stipulate to the probate court that Defendant will make no claim to any property of the estate except for the property described in Exhibit A of the Rule 11 Agreement, the Camaro, and $5,000.00;

d.  Relinquish any claim to the real property located at 11122 Sugar Mill Lane, Frisco, Texas and stipulate the home will be awarded to Plaintiff in its entirety;

e.  Accept the items listed on Exhibit A to the Rule 11 Agreement dated October 27, 2020 at 11122 Sugar Mill Lane, Frisco Texas 75033; and

f.   Accept delivery and title of the 1979 Chevrolet Camero at 11122 Sugar Mill
Lane, Frisco Texas 75033.

Additionally, Plaintiff shall:

a.   Pay $5,000.00 to Defendant;

b.   Deliver the property described in Exhibit A of the Rule 11 Agreement and the Camaro
to 11122 Sugar Mill Lane, Frisco, Texas 75033 and subsequently transfer title to the
Camaro; and

c.   Execute a global release of Defendant.

With this issue resolved, the Court turns to Plaintiff's request for additional damages.

## ii.    Additional damages

Second, Plaintiff seeks $133,410.20 in damages for "the additional cost of preserving and
maintaining real estate property caused by the delay in probating the estate due to the Ershicks not
consenting to her appointment" (Dkt. #23 at p. 9).  In support of her request for damages, Plaintiff
submits an affidavit from herself and a spreadsheet detailing the costs of preserving the estate (Dkt.
#23 at p. 9).  In response, Defendant contends that "Plaintiff makes no effort to prove that her
monetary damages resulted from Defendant's alleged breach" (Dkt. #30 at p. 17).   Indeed,
according to Defendant, Plaintiff's request for the additional costs "ignores the fact that the same
costs would have been incurred had there <u>not</u> been a repudiation of the Rule 11 Agreement" (Dkt.
#30 at p. 17) (emphasis in original).  To be sure, according to Defendant, because "Plaintiff asks
for specific performance which would clear 100% of the title to the house . . . if Plaintiff prevails,
she would still incur the same costs to pay the lien on the house and expenses of maintenance"
(Dkt. #30 at p. 17).

The general rule is that damages constitute an alternative remedy available only when
specific performance either is not sought or is not available. *Foust v. Hanson*, 612 S.W.2d 251,

253 (Tex. Civ. App.—Beaumont 1981, no writ); *see Heritage Housing Corp. v. Ferguson*, 674 S.W.2d 363, 365 (Tex. App.—Dallas 1984, writ ref'd n.r.e.).   However, in appropriate circumstances, the court may order, in addition to specific performance, payment of expenses incurred by plaintiffs as a result of a defendant's late performance. *Heritage Housing Corp*., 674 S.W.2d at 365–66; *see also Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 575 (Tex. App.—Fort Worth 2008, pet. denied); *see also Davis v. Luby*, No. 04-09-00662-CV, 2010 WL 3160000, at *3 (Tex. App.—San Antonio Aug. 11, 2010, no pet.) ("[T]he relief associated with specific performance may include monetary compensation in narrow circumstances—when it is deemed necessary to place the parties in the same position as if the contract had been performed in full.").

This compensation is not considered breach of contract damages, but rather "equalizes any losses occasioned by the delay by offsetting them with money payments." *Heritage Housing Corp*., 674 S.W.2d at 366.  The rationale for the compensation is that the contract is being enforced retrospectively and the equities adjusted accordingly. *Goldman v. Olmstead*, 414 S.W.3d 346, 362 (Tex. App.—Dallas 2013, pet. denied).  The trial court, in order to relate the performance back to the contract date, may equalize "any losses occasioned by the delay by offsetting them with money payments." *Id.*

Here, Plaintiff argues that she has incurred $133,410.20 in additional costs of preserving and maintaining estate property as a result of Defendant's delay in performing his obligations under the contract (Dkt. #23 at p. 9).  In response, Defendant asserts that Plaintiff would have incurred at least some of the same costs of maintaining the estate had there not been a breach of the Rule 11 Agreement.  Thus, the Court finds there is a factual dispute as to the amount of the damages Plaintiff has incurred as a result of Defendant's delay in performing in his obligations

44

under the Rule 11 Agreement. *See Paciwest*, 266 S.W.3d at 575 (finding trial court erred by determining that that appellees were precluded from presenting evidence at trial as to the damages they incurred as a result of other party's delay in performing its obligations under the contract); *see also TLC Hosp., LLC v. Pillar Income Asset Mgmt., Inc*., 570 S.W.3d 749, 773 (Tex. App.— Tyler 2018, pet. denied) (affirming trial court's award of delay damages). Stated differently, Plaintiff fails to establish as a matter of law that she is entitled to $133,410.20, the damages amount set forth in her motion, "as neither [Plaintiff's affidavit] nor the [spreadsheet] [] adequately explain the damages calculation or the various monetary amounts included therein." *NB Gathering IX Pref, L.L.C v. Nelson*, No. 3:20-CV-3491-K, 2022 WL 347610, at *3 (N.D. Tex. Feb. 4, 2022).

### iii.    Attorney's Fees

Lastly, Plaintiff seeks an award of $29,706.44 for additional attorney's fees that Plaintiff has incurred because of Defendant's breach of the contract (Dkt. #23 at p. 9). In support of her request, Plaintiff submits an affidavit of David Lowrance detailing the additional attorney's fees (Dkt. #23 at p. 9). In response, Defendant asserts that "Plaintiff is caught by her own argument, i.e. that the 'Rule 11 Agreement' is a contract" (Dkt. #34 at p. 8). According to Defendant, "[i]f so, then paragraph 6 [of the Rule 11 Agreement] is a contract that each party must pay her/his attorney fees" (Dkt. #34 at p. 8).

Here, as an initial matter, the Court finds Defendant's argument unpersuasive. Section six of the Rule 11 Agreement states: "Each party shall pay to [sic] their own attorney's fees and Linda Young shall pay any ad litem fees" (Dkt. #29, Exhibit 12). Clearly, contrary to Defendant's argument, the parties' agreement on this provision pertains to attorney's fees relating to the settlement of the original, underlying claims—not to attorney's fees incurred in enforcing the settlement agreement. *Herring*, 2011 WL 2739517, at *6. Indeed, "[n]othing in the Rule 11

Settlement Agreement indicate[s] an intent of the parties to foreclose the right to seek attorney's fees in future litigation seeking to enforce the terms of the settlement." *Innovative Vision Sols., LLC v. Kempner*, No. 01-20-00195-CV, 2022 WL 868130, at *14 (Tex. App.—Houston [1st Dist.] March 24, 2022, no pet.).  Thus, the Rule 11 Agreement does not bar Plaintiff from recovering her attorney's fees.

Moreover, under the Texas Civil Practice and Remedies Code, a person may recover reasonable attorney's fees, in addition to the amount of a valid claim and costs, if the claim is "for an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8)(b)(8).   Under § 38.001(8), a "valid claim" is not limited to an action seeking monetary damages and may include an action seeking specific performance of the underlying contract. *See Jarvis v. Peltier*, 400 S.W.3d 644, 655 (Tex. App.—Tyler 2013, pet. denied); *see also Woody*, 2013 WL 5744359 at *6 (Tex. App.—Amarillo Oct. 18, 2013, pet. denied) (mem. op.) (concluding that a judgment awarding specific performance on a breach of contract claim is a valid claim under § 38.001(8)); *see also Henry v. BG of Dallas Corp.*, No. 3:13-CV-2060-BF, 2014 WL 10919570, at *2 (N.D. Tex. Oct. 8, 2014) (awarding attorneys' fees in addition to granting a motion for enforcement of settlement agreement).   Thus, by obtaining specific performance to enforce the Rule 11 Agreement, Plaintiff is entitled to attorney's fees under § 38.001.

Further, Plaintiff has satisfied the remaining requirements under § 38.002.  Under § 38.002, to recover attorney's fees, (1) the claimant must be represented by an attorney, (2) the claimant must present the claim to the opposing party, and (3) payment must not have been tendered before 30 days have elapsed after the claim is presented. TEX. CIV. PRAC. & REM.CODE § 38.002.  Here, Plaintiff is represented by an attorney.  Plaintiff presented her claim to the opposing party, and payment has not been tendered (Dkt. #23 at p. 3).  Thus, an award of attorney's fees is appropriate.

Nonetheless, having reviewed the briefing regarding attorney's fees, the Court finds that Plaintiff's arguments as to the amount of fees that should be awarded are best saved for a Rule 54 motion for attorney's fees.  Accordingly, the Court will not address the amount of attorney's fees at this time.

## CONCLUSION

It is therefore **ORDERED** that that Plaintiff's Motion for Summary Judgment (Dkt. #23) is hereby **GRANTED in part**, and Defendant James Ershick's Motion for Summary Judgment (Dkt. #29) is hereby **DENIED**.  The damages issue remains to be determined.

**IT IS SO ORDERED**.

**SIGNED this 29th day of July, 2022.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE